UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOHN H. BALSEWICZ, *also known as* MELISSA BALSEWICZ,

Plaintiff,

v.

Case No. 17-CV-360-JPS

BYRAN BARTOW, TIMOTHY LUNDQUIST, CRAIG BLUMER, SGT. DARRYL FRANKLIN, EDWARD KREMER, DEE KAPITZKE, GERALD LENNOP, MICHAEL HELMEID, DR. FLECK, LINDSAY DANFORTH, JOHN BESSERT, BRIAN SCHRAA, JOHN LENZ, RENATA BACON, and JENNIFER JRNKA,

**ORDER**

Defendants.

Plaintiff, who is incarcerated at Waupun Correctional Institution, filed a *pro se* complaint under 42 U.S.C. § 1983, alleging that her civil rights were violated. (Docket #1). This matter comes before the Court on Plaintiff's motion to proceed *in forma pauperis*. (Docket #2). Plaintiff has been assessed and paid an initial partial filing fee of $35.71. 28 U.S.C. § 1915(b)(4).

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or employee of a governmental entity. *Id.* § 1915A(a). The Court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. *Id.* § 1915A(b).

A claim is legally frivolous when it lacks an arguable basis either in law or in fact. *Denton v. Hernandez*, 504 U.S. 25, 31 (1992); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *Gladney v. Pendelton Corr. Facility*, 302 F.3d 773, 774 (7th Cir. 2002). The Court may, therefore, dismiss a claim as frivolous where it is based on an indisputably meritless legal theory or where the factual contentions are clearly baseless. *Neitzke*, 490 U.S. at 327; *Gladney*, 302 F.3d at 774. "Malicious," although sometimes treated as a synonym for "frivolous," "is more usefully construed as intended to harass." *Lindell v. McCallum*, 352 F.3d 1107, 1109 (7th Cir. 2003); *Paul v. Marberry*, 658 F.3d 702, 705 (7th Cir. 2011).

To state a cognizable claim under the federal notice pleading system, the plaintiff is required to provide a "short and plain statement of the claim showing that [she] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). It is not necessary for the plaintiff to plead specific facts; her statement need only "'give the defendant fair notice of what the. . .claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *Christopher v. Buss*, 384 F.3d 879, 881 (7th Cir. 2004). However, a complaint that offers "'labels and conclusions'" or "'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "'that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Christopher*, 384 F.3d at 881.

In considering whether a complaint states a claim, courts should first "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. Legal conclusions must be supported by factual allegations. *Id.* If there are well-pleaded factual allegations, the Court must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that: (1) she was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon her by a person or persons acting under color of state law. *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The Court is obliged to give Plaintiff's *pro se* allegations, "'however inartfully pleaded,'" a liberal construction. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

Plaintiff alleges that she has gender dysphoria. Her allegations in this case arise from Defendants' alleged failure to treat Plaintiff's suicidal tendencies related to this condition. She alleges that the relevant events occurred while she was incarcerated at the Wisconsin Resource Center ("WRC") in Winnebago, Wisconsin. (Docket #1 at 4). Defendants are various employees at that institution. *Id.* The Court will explain Plaintiff's claims below, but notes at the outset that Plaintiff's allegations suffer from a lack of detail as to actors and dates. This will render the narrative somewhat disjointed.

Plaintiff alleges that she suffers from depression, bipolar disorder, and has suicidal ideation as a result of her gender dysphoria. *Id.* at 5. She

received "dialectical behavioral treatment" ("DBT")[1] at WRC for some unspecified period. *See id.* While there, she claims that the testing results that confirmed her gender dysphoria were not sent to the "G.D. Committee" for further consideration, including the possible approval of hormone therapy for Plaintiff. *Id.* at 6. She asserts that WRC staff, none of whom are identified specifically, lied to her about the fact that the results had been sent to the Committee. *Id.* Plaintiff claims that these lies caused an 11-month delay in her receiving hormone therapy. *Id.* Initially, she submitted requests for medical care regarding the delay. *Id.* Apparently, they were not answered to her satisfaction, so she filed an inmate complaint on the matter which was eventually rejected. *Id.*

On some later date, after being housed at another facility for a time, Plaintiff was returned to WRC for further DBT. *Id.* Plaintiff claims the treatment was not designed for treating transgendered individuals. *Id.* Nor were there, in her opinion, any staff qualified to run groups, programs, or classes regarding LGBT issues. *Id.* She also alleges that while at WRC, certain unnamed staff members told her that the WRC director, Byran Bartow ("Bartow"), said that he did not want transgendered individuals like Plaintiff at his facility. *Id.* These factors caused Plaintiff's depression to worsen, and she warned some unspecified staff members that she would engage in self-harm. *Id.* She also filed another inmate complaint about these problems, which was rejected. *Id.*

At some point either during or after this second round of treatment at WRC, Plaintiff sent a request for care to Dr. Craig Blumer ("Dr. Blumer"), the WRC clinical director. *Id.* Although she seems to think that DBT is not

---

[1] The nature of this treatment is not explained in the complaint.

the appropriate therapy for her, Plaintiff asked Dr. Blumer to keep her in that therapy group. *Id.* She also explained her complaints about the failure to transmit her medical reports to the G.D. Committee, and WRC's failure to provide qualified staff to treat LGBT issues. *Id.* Sometime thereafter, Plaintiff met with Dr. Blumer, stated that her depression was worsening, and warned Dr. Blumer that she would commit self-harm or suicide "in an attempt to get sexual reassignment surgery" or "gender reassignment surgery." *Id.* She states that her warning "fell on deaf ears" and that Dr. Blumer even tried to expunge records of her medical care request and their conversation. *Id.* Again, Plaintiff submitted an inmate grievance on these matters which was again rejected. *Id.*

Plaintiff next reports that while at WRC, she threatened self-harm in the form of castration—specifically, she told Sergeant Darryl Franklin ("Franklin"), social worker Jennifer L. Jrnka ("Jrnka"), psychological associate Lindsay E. Danforth ("Danforth"), and psychological associate Spiegelberg (whose first name is not given) that she planned to go outside and allow animals to mutilate her genitals. *Id.* at 7–8. They apparently ignored these suggestions, which Plaintiff alleges constituted deliberate indifference to her self-harm ideations. *Id.* Another inmate grievance and rejection ensued. *Id.* at 8.

At another time during her second stay at WRC—perhaps in late 2016—Plaintiff claims she told psychological care technicians John Bessert ("Bessert"), Brian Schraa ("Schraa"), and John K. Lenz ("Lenz") that she had thoughts of self-harm or suicide. *Id.* at 8. Plaintiff alleges that none responded satisfactorily to these threats, noting that Plaintiff lacked a plan or intent to carry out the actions. *Id.* Plaintiff claims that these individuals did not even document her reported threats of self-harm. *Id.* When Plaintiff

spoke with psychological care supervisor Gerald Lennop ("Lennop") about the matter, he agreed that something more should have been done. *Id.* Plaintiff filed another grievance on these issues, and it was rejected like the others. *Id.*

The remainder of Plaintiff's complaint describes three different suicide attempts she undertook in December 2016. First, on December 16, during a meeting with Jrnka, Plaintiff reiterated her thoughts of self-harm and said "my preference is to hang—come in on a cord, go out on a cord!" *Id.* at 9. She also threatened to overdose on medication at or around the time she would hang herself. *Id.* It appears that Plaintiff was thereafter moved into the restrictive housing unit ("RHU") on "temporary lock-up" ("TLU") status after making these threats. *Id.* Some staff members, including Jrnka, Danforth, and institution unit supervisor Edward Kremer ("Kremer"), consulted with each other and determined to issue Plaintiff a conduct report for making these suicide threats. *Id.*

Plaintiff alleges that the decision to place her in the RHU on TLU status, rather than pure observation, displayed the staff members' desire not to keep her safe but to punish her for threatening suicide. *Id.* Additionally, she complains that they gave her back property she could use to harm herself and placed her in the RHU cell farthest from staff, and did not conduct checks on her every fifteen minutes. *Id.* In particular, Plaintiff alleges that these staff members gave Plaintiff a pull-over shirt to wear in the RHU despite knowing that she had threatened to hang herself. *Id.* at 10. Apparently, at some point she tried to hang herself with the shirt and was discovered unconscious in her RHU cell. *Id.* She was taken to a local hospital for treatment and thereafter filed an inmate grievance which was dismissed. *Id.*

The next suicide attempt originated on December 22, 2016. *Id.* That day, Plaintiff had a meeting with Jrnka and Danforth to discuss the hanging attempt a few days earlier. *Id.* Sometime during this meeting, Plaintiff snatched a pair of scissors from Jrnka's desk and said, "anything can happen in a second." *Id.* Jrnka and Danforth interpreted this not as a suicide threat but a threat against Jrnka. *Id.* Lennop ordered Plaintiff to be placed in TLU again as a result. *Id.* Plaintiff says that this was not appropriate as she has "depressive issues" and Lennop was required to contact the psychological services unit prior to placing Plaintiff in TLU. *Id.* at 10–11. The next day, while in the RHU, Plaintiff made a medical care request informing psychological care supervisor Michael Helmeid ("Helmeid") that she should not be given items that could be used for self-harm. *Id.* at 11. This note seems to have gone unanswered. *Id.* Sometime shortly thereafter, Plaintiff broke her glasses, sharpened the lens on the concrete floor of her RHU cell, and proceeded to cut herself. *Id.* A staff member noticed this during rounds and Plaintiff was provided medical care for the wound she made on her forearm. *Id.* With respect to this incident, Plaintiff contends that Lennop and Helmeid knew of her self-harm tendencies and should have confiscated items, such as her glasses, that could be used to self-harm. *Id.* They also should have, in Plaintiff's opinion, contacted the psychological services unit "as required," although she does not explain the source of this requirement. *Id.* Another inmate grievance was filed and was dismissed. *Id.*

The final episode of self-harm Plaintiff describes occurred over several days—specifically, December 24 to December 31, 2016. *Id.* During this period, Plaintiff stashed away her prescribed doses of lithium to overdose with later, as she threatened to Jrnka that she would. *Id.* She

claims that despite her warning that she would commit suicide by medication overdose, no staff member—including Kremer, Jrnka, and Danforth—did anything to keep her from overdosing, such as inspecting her mouth at regular intervals to ensure she was not saving up pills to take at once. *Id.* at 11–12. Indeed, Plaintiff asserts that during this period, she warned that she would save her pills to overdose with. *Id.* at 12. On December 31, 2016, she took twenty-five lithium pills at once. *Id.* A staff member (who is not a defendant here) saw this occur and summoned medical assistance. *Id.* Plaintiff was taken to a local hospital and treated. *Id.* Because Plaintiff felt that this final suicide attempt was again caused by the WRC staff's "lazy" attitude and failure to take her threats seriously, she filed another inmate complaint, which was dismissed. *Id.* at 12–13.

On these allegations, the Court finds that Plaintiff may proceed on Eighth Amendment claims for deliberate indifference to her serious medical needs—gender dysphoria and suicidal ideation. To state a claim of deliberate indifference to a serious medical need, the plaintiff must show: (1) an objectively serious medical condition; (2) that the defendants knew of the condition and were deliberately indifferent in treating it; and (3) this indifference caused the plaintiff some injury. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). The deliberate indifference inquiry has two components: "The official must have subjective knowledge of the risk to the inmate's health, and the official also must disregard that risk." *Id.* Even if an official is aware of the risk to the inmate's health, "he is free from liability if he 'responded reasonably to the risk, even if the harm ultimately was not averted.'" *Id.* (quoting *Farmer*, 511 U.S. at 843). Negligence cannot support a claim of deliberate indifference, nor is medical malpractice a

constitutional violation. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

As to Plaintiff's claim that Defendants were deliberately indifferent to her gender dysphoria, the Seventh Circuit has held that gender dysphoria is a serious medical need. *See Fields v. Smith*, 653 F.3d 550, 556 (7th Cir. 2011). Plaintiff alleges that Defendants were deliberately indifferent to this need because one of the treatments she received for her gender dysphoria, DBT, is not suitable for transgendered individuals. Plaintiff further alleges that the testing results that confirmed her gender dysphoria were not sent to the appropriate committee for review, resulting in an 11-month delay in her other form of treatment, hormone therapy. *See McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) (a claim of delayed care may violate the Eighth Amendment if it caused the inmate's condition to worsen or unnecessarily prolonged her pain). Though Plaintiff has not named as a defendant anyone who she contends failed to send her testing results to the appropriate committee, she does allege that she told Dr. Blumer about the same and that he failed to act on her requests. It may be that Defendants responded adequately to Plaintiff's gender dysphoria, but, given the low bar applied at the screening stage, the Court finds it appropriate to let this claim proceed.

Plaintiff may also proceed on her claim that Defendants were deliberately indifferent to her risk of suicide. *See Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) ("In order to be liable under the Eighth Amendment, a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act."). Plaintiff claims that she warned WRC staff numerous

times that she was suicidal and ultimately attempted suicide three times at the end of 2016. Again, it may be that Defendants responded adequately to Plaintiff's threats and attempts of suicide, but, given the low bar applied at the screening stage, the Court finds it appropriate to let this claim proceed.

The question remaining, then, is which Defendants personally participated in the Eighth Amendment violations alleged in Plaintiff's complaint such that they should remain in this action. "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996).

This question is straightforward as to Defendants Franklin, Kremer, Danforth, Jrnka, Bessert, Schraa, Lennop, Helmeid, Dr. Blumer, and Lenz, as the Plaintiff has alleged that each of them knew of her suicidal ideations or attempts and failed to adequately respond. As to Dr. Blumer, the Plaintiff further alleges that he knew of her gender dysphoria and her disappointment with the way it was being treated, and that he tried to expunge records of her medical care request related to her gender dysphoria. These Defendants must remain in this action.

The other Defendants, however, must be dismissed. Defendant Renata Bacon ("Bacon"), who the Plaintiff claims is an Institution Complaint Examiner at WRC, (Docket #1 at 4), must be dismissed because Plaintiff has not alleged that Bacon was personally involved in any of the claimed Eighth Amendment violations. Although Plaintiff has alleged that she submitted an inmate grievance for each incident described above and all were rejected or dismissed, *see* (Docket #1 at 6–13), the Court cannot assume that it was Bacon who disposed of these grievances or that the

dispositions had any bearing on Plaintiff's medical care. Therefore, the Plaintiff's allegations are not sufficient to state a claim against Bacon. Similarly, Plaintiff's allegations against Dr. Angela Fleck ("Dr. Fleck") also fail to state a claim. Plaintiff mentions Dr. Fleck only once in her complaint, stating that she told Dr. Fleck not to give her anything with which she could self-harm. (Docket #1 at 12). But Plaintiff makes no affirmative allegations against Dr. Fleck that relate to her Eighth Amendment claims, and therefore Dr. Fleck must be dismissed.

Finally, it appears that Plaintiff named Defendants Bartow, Lundquist, and Dee Kapitzke ("Kapitzke") only because they have supervisory responsibilities at WRC and, in Plaintiff's view, should be held liable for the constitutional violations committed by the staff they supervise. (Docket #1 at 4). Supervisors can be liable under Section 1983 if they "know about the conduct [that amounts to a constitutional deprivation] and facilitate it, condone it, or turn a blind eye for fear of what they might see." *Backes v. Village of Peoria Heights, Ill.*, 662 F.3d 866, 870 (7th Cir. 2011) (citation omitted). In other words, supervisors may be held liable under Section 1983 for the actions of their subordinates if they acted "either knowingly or with deliberate indifference." *Id.* Plaintiff has not alleged, beyond a single conclusory allegation that they are supervisors, that Lundquist or Kapitzke knew about, condoned, or facilitated the conduct that underlies Plaintiff's Eighth Amendment claims. These allegations are not sufficient to state a claim for supervisor liability under Section 1983. As to Bartow, Plaintiff alleges that Bartow is a supervisor and further alleges that she heard Bartow did not want transgendered people at WRC. (Docket #1 at 6). While Plaintiff might suspect, because of his bias, that Bartow had knowledge of or directed the constitutional deprivation relating to her

gender dysphoria, Plaintiff has not affirmatively alleged the same. Bartow, Lundquist, and Kapitzke must be dismissed.

For the reasons stated above, the Court finds that Plaintiff may proceed on the following claims: (1) an Eighth Amendment claim of deliberate indifference to her serious medical need arising from her gender dysphoria, and (2) an Eighth Amendment claim of deliberate indifference to her serious medical need arising from her repeated threats and attempts of suicide.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for leave to proceed *in forma pauperis* (Docket #2) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants Byran Bartow, Timothy Lundquist, Dee Kapitzke, Dr. Angela Fleck, and Renata Bacon be and the same are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that pursuant to an informal service agreement between the Wisconsin Department of Justice and this Court, copies of Plaintiff's complaint and this order will be electronically sent to the Wisconsin Department of Justice for service on Defendants;

**IT IS FURTHER ORDERED** that, pursuant to the informal service agreement between the Wisconsin Department of Justice and this Court, Defendants shall file a responsive pleading to the complaint within sixty (60) days of receiving electronic notice of this order;

**IT IS FURTHER ORDERED** that the Secretary of the Wisconsin Department of Corrections or his designee shall collect from Plaintiff's prison trust account the balance of the filing fee by collecting monthly payments from Plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the prisoner's trust account

and forwarding payments to the Clerk of Court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. § 1915(b)(2). The payments shall be clearly identified by the case name and number assigned to this action;

**IT IS FURTHER ORDERED** that a copy of this order be sent to the warden of the institution where the inmate is confined;

**IT IS FURTHER ORDERED** that, pursuant to the Prisoner E-Filing Program, Plaintiff shall submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the Court. The Prisoner E-Filing Program is in effect at Dodge Correctional Institution, Green Bay Correctional Institution, Waupun Correctional Institution, and Wisconsin Secure Program Facility and, therefore, if Plaintiff is no longer incarcerated at any of these institutions, she will be required to submit all correspondence and legal material to:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

Plaintiff is further advised that failure to make a timely submission may result in the dismissal of this action for failure to prosecute.

In addition, the parties must notify the Clerk of Court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Dated at Milwaukee, Wisconsin, this 12th day of June, 2017.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge