# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

JOHN H. BALSEWICZ, *also known as* MELISSA BALSEWICZ,

     Plaintiff,

v.

CRAIG BLUMER, SGT. DARRYL FRANKLIN, EDWARD KREMER, GERALD LENNOP, MICHAEL HELMEID, LINDSAY DANFORTH, JOHN BESSERT, BRIAN SCHRAA, JOHN LENZ, JENNIFER SRNKA, and STEVE SCHMIDT,

     Defendants.

Case No. 17-CV-360-JPS

**ORDER**

## 1. INTRODUCTION

Plaintiff John H. Balsewicz, a transgender prisoner also known as Melissa Balsewicz ("Balsewicz"), is currently incarcerated at Waupun Correctional Institution ("Waupun"). She alleges that several medical staff members at the Wisconsin Resource Center ("WRC"), a mental health institution where she was incarcerated from June 2016 to February 2017, were deliberately indifferent to her risk of self-harm, in violation of her rights under the Eighth Amendment. Next, she alleges that two doctors, one at the WRC and another at Waupun, were deliberately indifferent to her gender dysphoria, in violation of her rights under the Eighth Amendment, because they failed to promptly transmit her gender dysphoria diagnosis to the appropriate committee within the Wisconsin Department of Corrections ("Corrections") so that she could begin

receiving treatment. Finally, Balsewicz alleges that the WRC medical staff defendants retaliated against her for filing a grievance against a WRC social worker by removing her from therapy and by ignoring her suicide threats, in violation of her rights under the First Amendment.

The parties have filed cross-motions for summary judgment. (Plaintiff's Motion, Docket #33; Defendants' Motion, Docket #41). Those motions are now fully briefed and ripe for adjudication. *See* (Docket #33–#37, #41–#62, #65–#66, #68–#73). For the reasons explained below, Defendants' motion must be granted. Balsewicz's motion will be denied as moot, and this case will be dismissed.

## 2. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016).

## 3. RELEVANT FACTS

The following facts are material to the disposition of the defendants' motion for summary judgment. They are drawn from the parties' factual briefing, (Docket #43–#56, #61–#62, #71–#73), unless otherwise noted. The Court will discuss the parties' principal factual disputes as appropriate.

At all times relevant to this case, Balsewicz was incarcerated either at Waupun or at the WRC, which is a facility that concentrates on treating Corrections inmates who are in need of specialized mental health services. Although Balsewicz has been treated at the WRC on several occasions during her incarceration, the relevant time period for her claims in this case started when she was admitted to the WRC on June 16, 2016.

During this time period, all but one of the defendants were employees at the WRC. Doctor Craig Blumer ("Dr. Blumer") was the clinical director, Michael Helmeid ("Helmeid") and Gerald Lennop ("Lennop") were psychiatric care supervisors ("PCS"), John Bessert ("Bessert"), John Lenz ("Lenz"), and Brian Schraa ("Schraa") were psychiatric care technicians ("PCT"), Lindsay Danforth ("Danforth") was a psychological associate, Jennifer Srnka ("Srnka") was a social worker, Edward Kremer ("Kremer") was a unit supervisor, and Darryl Franklin ("Franklin") was a sergeant. Doctor Steve Schmidt ("Dr. Schmidt"), the only non-WRC defendant, was a supervisor in the psychological services unit at Waupun, where Balsewicz was incarcerated before and after she was placed at WRC.

### 3.1 Gender Dysphoria Diagnosis and Referral for Treatment

Corrections has a Transgender Committee whose purpose is to offer guidance or direction in making determinations as to appropriate treatment and accommodations for inmates who are transgender, who meet DSM-5 criteria for gender dysphoria,[1] or who have a verified intersex condition.

---

[1]According to the *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition ("DSM-5"), the American Psychiatric Association's manual for classifying and diagnosing mental illness, "gender dysphoria" is a conflict between a person's physical or assigned gender and the gender with which he identifies, causing distress at the mismatch between his identity and his body. *See What is Gender*

The Transgender Committee meets monthly to discuss requests from individual inmates.

If an inmate requests transgender services, such as hormone therapy or sex reassignment surgery, a psychological services unit staff member conducts an in-person assessment and writes a report about the inmate's alleged gender issue. When the report is complete, the staff member, or his or her supervisor, forwards a copy to Doctor Kevin Kallas ("Dr. Kallas"), the mental health director for Corrections and a member of the Transgender Committee. Dr. Kallas decides whether to refer the inmate for further assessment by Corrections' outside transgender consultant, Cynthia Osborne ("Osborne").

Osborne's evaluation of an inmate includes review of relevant health records, pre-sentence investigations, and prison incident reports, as well as a meeting with the inmate. Osborne prepares a written report with her recommendation for treatment, and Corrections makes its treatment decision based on that report.

In or around early April 2016, while she was incarcerated at Waupun, Balsewicz underwent a gender dysphoria assessment. The assessment was conducted by Bonnie Halper, a psychological associate at Waupun. On April 26, 2016, Halper sent her report to Dr. Schmidt by email, and asked him to forward it to the Transgender Committee for consideration of Balsewicz's request for gender dysphoria treatment. On April 28, 2016, Dr. Schmidt responded to Halper's email, but his response only pertained to issues involving another inmate. He did not forward

_Dysphoria?_, American Psychiatric Association (February 2016), _https://www.psychiatry.org/patients-families/gender-dysphoria/what-is-gender-dysphoria._

Halper's report about Balsewicz to the Transgender Committee. He avers that this failure was an oversight and was not intentional; he says he merely forgot to send it along. (Docket #46 at 3).

About two months later, on June 16, 2016, Balsewicz was admitted to the WRC for mental health issues including depression and borderline personality disorder. On August 19, 2016, in a session with a non-defendant WRC psychologist, Balsewicz told the psychologist that he had undergone a gender dysphoria assessment at Waupun and was waiting to learn if he would be permitted to see Osborne. (Docket #44-1 at 46). The psychologist said she would follow up with Dr. Blumer, the clinical director at the WRC, to determine where the Transgender Committee was in terms of its review of Balsewicz's assessment. *Id.* Dr. Blumer testifies in his declaration that he first learned from the psychologist on September 23, 2016 that Balsewicz had undergone a gender dysphoria assessment while at Waupun. (Docket #48 at 3).[2] He then immediately forwarded the report to Dr. Kallas. *Id.* Dr. Kallas reviewed it and advised Dr. Blumer that Balsewicz was an appropriate candidate to see Osborne for further evaluation. Balsewicz was placed on a list to see Osborne at her next available opening, which was not until February 2017.

Osborne evaluated Balsewicz and confirmed the diagnosis of gender dysphoria. In her written report, Osborne recommended that Corrections defer consideration of hormone treatment for at least a year due to

---

[2]Balsewicz claims that Dr. Blumer knew about the report beginning on August 19, 2016, which is the day Balsewicz told his psychologist about it. (Docket #61 at 23). The only evidence she cites for this proposition is the psychologist's note from August 16, which does not indicate that Dr. Blumer was informed that day. *See* (Docket #37-2 at 29). Therefore, Balsewicz has not created a genuine dispute as to this fact.

Balsewicz's lack of psychological stability. Osborne recommended that Balsewicz engage in treatment to focus on learning positive coping skills, and while doing so, that she be permitted access to the usual accommodations available to other inmates with gender dysphoria.

Osborne re-evaluated Balsewicz on April 2, 2018 and issued a corresponding report on May 11, 2018 (after this case was filed). In that report, Osborne observed that Balsewicz still displayed maladaptive personality traits, but given the duration of Balsewicz's reported gender dysphoria, it was reasonable for Balsewicz to start hormone therapy. As of the time of the filing of the parties' summary judgment materials, Balsewicz had not yet started hormone therapy, but the defendants indicate the treatment is imminent.

Dr. Kallas testified by declaration that even though there was a delay from April 2016 to September 2016 in his receiving the gender dysphoria assessment report that Halper prepared, there was not a resulting delay in Balsewicz receiving hormonal treatment. (Docket #50 at 6). This is because Osborne's February 2017 recommendation to defer hormones was based largely upon Balsewicz's longstanding history of psychological problems and personality-based vulnerabilities. *Id.* Therefore, an earlier evaluation would not, in Dr. Kallas' opinion, have resulted in a more favorable recommendation for hormones. *Id.*

### 3.2    Balsewicz's Depression and Suicide Attempts

Upon her admission to the WRC in June 2016 (after Halper's assessment was completed but before Dr. Blumer sent Halper's report to Dr. Kallas), Balsewicz reported that she had been depressed her whole life and that she had constant thoughts of suicide. Her admission assessment chart indicates that she had been diagnosed with major depressive

disorder, borderline personality disorder, and gender dysphoria (provisional). (Docket #48-1 at 25).[3] Her initial treatment plan included staff monitoring her emotional and mental health, as well as participation in a depression support group and dialectical behavior therapy ("DBT"). DBT is a treatment that is designed for individuals with borderline personality disorder who struggle with life-threatening behaviors, including suicidality and intentional self-harm. On August 23, 2016, Balsewicz signed a DBT agreement, indicating that she would commit to treatment for at least six months and would commit to reducing life-threatening behaviors. On August 30, 2016, staff at the WRC added a goal of "being free from suicidal thoughts and attempts" to her treatment plan.

In September 2016, Balsewicz reported on multiple occasions that she had a decreased urge to harm herself or commit suicide. She continued with group therapy for her depression and she participated positively on occasion, although she was sometimes disruptive during group sessions. In October 2016, she reported increased urges to commit suicide, and those impulses were discussed in individual therapy sessions. During those sessions, Balsewicz did not report a current intent or plan to follow through on her thoughts of suicide. At the end of October, Balsewicz reported that she was feeling better overall, but still struggled with depression.

In November 2016, Balsewicz's DBT treatment providers at the WRC noted that Balsewicz's primary concern in her sessions was her gender dysphoria, not the conditions for which she was referred to WRC to be treated with DBT. Balsewicz claims that her depression stemmed from not being treated for her gender dysphoria. Balsewicz began to refuse to

---

[3] The provisional gender dysphoria diagnosis was the one given by Halper. *See* (Docket #44-1 at 121–22; #50 at 4).

participate in some DBT activities, and treatment providers began to question her motivation to continue with the treatment. Throughout November, Balsewicz reported suicidal urges, but told her treatment providers that she had no imminent intent to act on the urges.

In a November 29, 2016 session with defendant Srnka, Balsewicz stated that she no longer wanted to be in individual therapy. She revoked her consent for staff to speak to her family, and she told Srnka that she had already said her goodbyes to her family. After the session, Srnka sent an email to other members of the WRC staff—Dr. Blumer, Franklin, Danforth, and Spiegelberg—expressing her concern about Balsewicz and advising that staff keep an "extra eye on [her] in case [she] does try anything." (Docket #49-1 at 9). Spiegelberg responded, stating that she would conduct a suicide risk assessment later that day during her session with Balsewicz. *Id.* at 9. She later reported that Balsewicz was not actively suicidal, based on Balsewicz's statement to her that she had not "gotten to that point yet." *Id.* at 8–9. However, Spielberg went on to say that "[Balsewicz] does intend to die by hanging. [She] expressed that [she] came into this world by a cord and that [she] will leave by a cord." *Id.* The next day, November 30, Danforth responded to the group email that she "passed this information on to the PCTs and asked them to keep a close eye on [Balsewicz]." *Id.* at 8. She also "requested that they do a room search just to make sure [she] doesn't have any ligatures in [her] cell." *Id.*

In December 2016, Balsewicz's treatment providers noted her commitment level to DBT to be low, and for that reason, WRC staff agreed

that Balsewicz should be removed from the DBT program.[4] She continued with the other portions of her treatment plan.

On December 9, 2016, Danforth wrote to Dr. Blumer by email to express her heightened concern about Balsewicz's suicide threats. She indicated that Balsewicz said she would kill herself by hanging if she was transferred back to Waupun. *See* (Docket #49-1 at 12–13). Dr. Blumer responded that Balsewicz's treatment team at the WRC should assess her level of suicide risk and respond accordingly. *Id.*[5] He continued: "I encourage you to continue to do what you are doing in increasing awareness and monitoring by staff, offering appropriate treatment and assessing risk. If the least restrictive means of insuring [her] safety is [clinical observation] then that is where [she] should be placed." *Id.*

On December 16, 2016, Balsewicz reported to Srnka specific plans and means to follow through with a suicide attempt. Specifically, she stated that she would take pills and cut both of her wrists. (Docket #44-1 at 5). She named several objects available in the prison that could be sharpened and used to cut her wrists, including a cocoa butter lid, the plastic from a deodorant stick, or her glasses. *Id.* She also said she had asked other inmates to give her their medication, but none agreed. *Id.*

---

[4]Balsewicz attempts to dispute that it was her own behavior that resulted in her being removed from DBT, (Docket #61 at 28), but she cites to no evidence for this proposition. Further, several notes from Balsewicz's treatment providers indicate that Balsewicz was removed from DBT because of her lack of commitment to DBT and because she focused on her gender dysphoria during DBT. DBT is intended to address self-harming behavior, not gender dysphoria. *See, e.g.,* (Docket #48-1 at 9, 18 and #49-1 at 2, 7, 9).

[5]As the clinical director at the WRC, Dr. Blumer was not a direct member of Balsewicz's treatment team. (Docket #48-1 at 3). Rather, he was available to members of Balsewicz's treatment team for consultation. *Id.*

Srnka consulted with Danforth that day, and together they agreed to move Balsewicz to the "high management unit" and place her on clinical observation status. *See* (Docket #44-1 at 5). There are cameras in the observation cells to assist with observation, and staff also check on the inmates housed on high management every fifteen minutes. (Docket #49 at 4). Balsewicz's clothing was taken away immediately upon being put on observation status and she was given a security smock and a mattress. However, in the afternoon of that day, Srnka and Danforth met with her, assessed her, and decided to give her clothes back because, according to an email by Danforth, Balsewicz "had been cooperative with the observation placement" and "had not indicated [she] had been having thoughts of hanging [herself]." (Docket #49-1 at 14). Balsewicz was consulted about this decision and agreed it was safe for her to have clothing.

During the following two weeks, Balsewicz attempted to commit suicide three times.

### 3.2.1   First Self-Harm Incident

On December 18, 2016, after Balsewicz had been monitored every fifteen minutes for about two days, a non-defendant WRC staff member found Balsewicz with a ligature tied around her neck and the other end tied to the back window of her cell. Balsewicz had torn her shirt into pieces and used those pieces to make the ligature. She was on her knees, slumped over to her side. (Docket #44-1 at 4). The staff member who found her called for security, the ligature was removed, and a nurse conducted a medical assessment. Balsewicz was later sent to a local hospital for evaluation. Upon

her return, Balsewicz was not allowed clothing in the observation cell and was instead given a security smock.[6]

The next day, Balsewicz reported being free of suicidal ideation. A day after that, on December 20, she said thoughts of suicide had returned, but she said she had no intention of acting on the urges and she asked to be removed from observation status. WRC staff allowed her to have clothing and a book, but did not immediately remove her from observation status. On December 21, staff released Balsewicz from observation status after she reported that her medication was helping her mood and that she had no suicidal ideations or thoughts of self-harm.

On December 22, Srnka and Danforth met with Balsewicz for a therapy session. They discussed a safety plan for Balsewicz which included: (1) Balsewicz checking in with a first shift staff member by 2:00 p.m. each day about her mood; (2) staff searching Balsewicz's cell weekly for contraband to ensure she did not have means to harm herself; and (3) Balsewicz remaining compliant with medication and attending all scheduled therapy activities. Balsewicz agreed to the safety plan.

---

[6]In an email sent December 22, 2016—after Balsewicz's first suicide attempt—Danforth stated that Balsewicz had told Srnka during the December 16 meeting that she did not intend to kill herself by hanging because she would get caught. (Docket #49-1 at 14). Balsewicz disputes this, stating that Danforth was not at the meeting and therefore could not have heard the statement. (Docket #61 at 12). Further, Balsewicz believes that the timing of Danforth's email is "suspicious," because it suggests Danforth was trying to craft a story to explain why Balsewicz was permitted to have clothing in her observation cell. *Id.* Balsewicz does not actually disavow the statement that Danforth alleges Balsewicz made to Srnka. *Id.* This dispute is not material, because even when construing this fact in Balsewicz's favor, and therefore assuming Balsewicz did not tell Srnka on December 16 that she would not kill herself by hanging, the outcome of the defendants' motion is not changed, for the reasons explained in the analysis section to follow.

The session ended with an incident that the parties describe somewhat differently. It is undisputed that Balsewicz grabbed a pair of scissors from near Srnka and warned that "anything can happen in a second." Srnka and Danforth both reported the incident. Danforth said she believed Balsewicz was trying to come across as "being 'helpful' to Srnka by letting her know 'hey you have a weapon sitting out.'" (Docket #49-1 at 18). But given Balsewicz's history of violence and her decision to reach over and grab the scissors, the incident "[felt] like an indirect threat and it was scary." *Id.* Balsewicz received a conduct report for the incident. The next day, December 23, Balsewicz was moved back to the high management unit for increased monitoring.

Balsewicz disputes some details of the scissor incident, claiming that it was not a threat, but she does not dispute that she received a conduct report due to the incident or that it was because of the conduct report that she was sent to the high management unit. (Docket #61 at 18).

### 3.2.2 Second Self-Harm Incident

Despite the increased monitoring of the high management unit, on December 24, 2016, Balsewicz managed to cut herself on her arm by breaking her eyeglasses and using the glass like a blade. Because of this, Balsewicz was placed back on clinical observation status. Three days later, on December 27, she warned staff that she should remain in clinical observation and she was, therefore, kept there.

### 3.2.3 Third Self-Harm Incident

On December 31, 2016, Balsewicz called a PCT over to her cell and stated that she had an emergency. She pulled out a bag that she claimed contained twenty-five 300mg lithium pills and swallowed a handful of them. Balsewicz was sent to the hospital for evaluation. There, she was

monitored and tested, and her lithium levels were on the high end of normal. Balsewicz says that she was made to vomit at the hospital, and her lithium levels would have been much higher but for that. She was admitted to the hospital and remained there until January 2, 2017. (Docket #44-1 at 1). Once back at the WRC, Balsewicz received liquid, as opposed to capsule, lithium medication. *Id.*

In the days leading up to the overdose attempt, the parties agree that Balsewicz had reported that her medication was helping her mood. The defendants point out that, based on this, it was reasonable for them to believe Balsewicz was taking her medication, not hoarding pills.

### 3.3    Retaliation for Complaining About Staff

The final events relevant to this lawsuit stem from an inmate complaint that Balsewicz sent to the Inmate Complaint Examiner ("ICE") at the WRC on or around January 18, 2017. In that complaint, Balsewicz alleged that Srnka had committed sexual misconduct during a therapy appointment on November 1, 2016. Specifically, she alleged that Srnka would initiate "sexually explicit conversation" and also gave Balsewicz a pair of "sz 8 teal blue panties." (Docket #47-3 at 11). In the same complaint (and in her subsequent appeal of the complaint), Balsewicz also alleged that she had reported Srnka's behavior to Spiegelberg and was not taken seriously. *Id.* at 11–13. She claimed in the grievance that she was taken off of DBT and her suicide threats were ignored all in retaliation for her having reported Srnka. *Id.*

Given the nature of the allegations, the ICE referred the matter to be investigated pursuant to the Prison Rape Elimination Act ("PREA"). On February 23, 2017, the PREA investigator wrote to Balsewicz to inform her

that WRC had investigated the claim and found no PREA violations. (Docket #37-4 at 16).

4. **ANALYSIS**

As noted above, Balsewicz proceeds on three claims. The first is an Eighth Amendment claim of deliberate indifference to her serious medical need arising from her repeated threats and attempts of suicide, alleged against all WRC defendants. The second is an Eighth Amendment claim of deliberate indifference to her serious medical need arising from her gender dysphoria, alleged against Drs. Schmidt and Blumer. The third is a First Amendment retaliation claim alleged all WRC defendants. The Court will address each in turn.

### 4.1 Deliberate Indifference to Balsewicz's Suicidality

Balsewicz claims that the WRC defendants were deliberately indifferent to her risk of suicide, in violation of her rights under the Eighth Amendment. To show deliberate indifference, a plaintiff must prove that "(1) [she] had an objectively serious medical condition; (2) the defendants knew of the condition and were deliberately indifferent to treating [her]; and (3) this indifference caused [her] some injury." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). With respect to self-harming or suicidal behavior, the Seventh Circuit holds that suicide satisfies the "serious medical condition" element. *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014). The *Collins* court provides further relevant instruction:

> Where the harm at issue is a suicide or attempted suicide, the second, subjective component of an Eighth Amendment claim requires a dual showing that the defendant: (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally

disregarded the risk. [*Matos ex. rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003)]; *see also Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (defendant must be aware of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing the act).

With respect to the first showing, "it is not enough that there was a danger of which a prison official should have been aware," rather, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Estate of Novack*, 226 F.3d at 529 (emphasis added). In other words, the defendant must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life. *Id.*; [*Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001)] (issue is whether the defendant was subjectively "aware of the substantial risk that [the deceased prisoner] might take his own life"). Liability cannot attach where "the defendants simply were not alerted to the likelihood that [the prisoner] was a genuine suicide risk." *Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484, 488 (7th Cir. 2001).

. . .

[As to the second showing], [d]eliberate indifference requires a showing of "more than mere or gross negligence, but less than the purposeful or knowing infliction of harm." *Matos*, 335 F.3d at 557; *Estate of Novack*, 226 F.3d at 529. We have characterized the required showing as "something approaching a total unconcern for [the prisoner's] welfare in the face of serious risks." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). To establish deliberate indifference, a plaintiff must present evidence that an individual defendant intentionally disregarded the known risk to inmate health or safety. *Matos*, 335 F.3d at 557. A defendant with knowledge of a risk need not "take perfect action or even reasonable action[,] ... his action must be reckless before § 1983 liability can be found." *Cavalieri v. Shepard*, 321 F.3d 616, 622 (7th Cir. 2003).

. . .

[In sum,] [t]he deliberate indifference standard imposes a "high hurdle" for a plaintiff to overcome.

*Collins v. Seeman*, 462 F.3d 757, 761–62 (7th Cir. 2006).

The WRC defendants were certainly on notice of Balsewicz's suicidality. She openly discussed her urges to harm herself from the time she was admitted to the WRC; indeed, that was a reason for her admission. Nonetheless, the WRC defendants are entitled to judgment as a matter of law on Balsewicz's deliberate indifference claim because no reasonable jury could find that they intentionally disregarded Balsewicz's risk of suicide.

The defendants kept careful watch over Balsewicz from the moment she expressed a present intent and plan to commit suicide. She was placed in observation, where she was subject to continual video monitoring and was checked on every fifteen minutes. On each of the three occasions that Balsewicz attempted suicide, staff members caught her in the act in time to stop her and responded by examining her or sending her to the hospital for evaluation and increasing her monitoring. Defendants Srnka and Danforth assessed Balsewicz regularly during the two-week period of suicidality. After the first suicide attempt, they agreed to give Balsewicz clothing and then take her off observation status only after she consistently expressed being free of suicidal urges. They also made a safety plan with Balsewicz and gained her consent to that plan. Finally, they talked amongst themselves and the rest of Balsewicz's treatment team about the best, but least restrictive, means to keep Balsewicz safe. These responses to Balsewicz's suicide risk fall far short of "a total unconcern for [her] welfare." *Duane*, 959 F.2d at 677.

Balsewicz's arguments to the contrary are unavailing. First, she argues that the WRC defendants should have known that she would

attempt suicide by hanging because she had told them she would and because she had attempted suicide by hanging years earlier. Therefore, she says, the defendants should not have allowed her to have clothing in her observation cell. It is true that, on a couple of documented occasions during her time at the WRC, Balsewicz mentioned hanging as one of multiple ways she could kill herself in prison. But it is undisputed that Balsewicz also told Srnka in their December 16, 2016 meeting, just before her first attempt, that she could cut herself or overdose on her medication. Even if Balsewicz did not specifically disavow a plan to kill herself by hanging in her December 16 meeting with Srnka as the defendants say she did, Balsewicz had at the very least provided reason to doubt that she had settled on hanging as her intended method.

Further, Balsewicz was initially placed on observation status on December 16 without clothing, and only wearing security smock, after she told Srnka about her intention and plan to commit suicide. Only after Srnka and Danforth met with Balsewicz that afternoon and discussed Balsewicz's mood, which had improved, did they permit her to have clothing in her observation cell. Balsewicz was consulted about this decision and agreed it was safe for her to have clothing. In light of all of these circumstances, it was not deliberately indifferent for the defendants to respond to Balsewicz's initial risk of suicidality by placing her on heightened monitoring but allowing her to have clothing.

As to her second suicide attempt, Balsewicz argues the defendants were deliberately indifferent for not taking away her eyeglasses. She points out that she told Srnka in the December 16 meeting that eyeglasses were one possible tool for cutting herself. She also cites to a psychological services request form that she submitted on December 23, 2016, the day

before she cut herself, in which she wrote that "[inmates with] suicidal tendencies should not be given means to self harm." (Docket #37-3 at 37). However, she goes on in that form to discuss several possible tools of self harm, including clothing and scissors. *Id.*

As with the first suicide attempt, the defendants' conduct before and in response to the second attempt on December 24, 2016 did not amount to deliberate indifference. Balsewicz had been released from clinical observation into general population on December 21 because of her visible improvement and her statements to staff that she did not intend to harm herself. She was placed into the high management unit on December 22, not because she had displayed new or increased signs of suicidality, but because of her behavior in a therapy session that Danforth and Srnka understood to be threatening. There is no evidence in the record to show that the WRC defendants should have known, leading up to December 24, 2016, that Balsewicz was still actively suicidal. To the contrary, Balsewicz had just agreed to comply with a safety plan. That she managed to cut herself with her eyeglass while in the high management unit does not prove deliberate indifference.

Finally, as to her third suicide attempt, Balsewicz argues that the defendants should have known she would attempt suicide by overdosing on her medication because, as with hanging and cutting, she had threatened this means of suicide in the past. She does not present evidence that the defendants knew she was hoarding her pills. Instead, it is undisputed that in the days leading up to the third attempt, Balsewicz reported that her medicine was helping her mood. (Docket #61 at 16–17). Further, WRC staff acted as soon as they possibly could when they learned that Balsewicz ingested a handful of pills, because she did it, intentionally, right in front of

a WRC staff member.[7] Allowing Balsewicz to take necessary medication, and assuming she was indeed taking it when she said she was, is not evidence of deliberate indifference.

Balsewicz placed the WRC defendants in the almost impossible position of trying to protect her from herself every minute of every day from every possible means by which she could harm herself. This is not what the Eighth Amendment demands. Defendants' efforts to monitor and counsel her, while providing the least restrictive detention possible, demonstrates not indifference but an overall concern for Balsewicz's wellbeing. *See Bowers v. Pollard*, 602 F. Supp. 2d 977, 993 (E.D. Wis. 2009) (noting that a suicidal inmate presents prison officials with "a dilemma with no easy options").

Prison officials are not charged with choosing the perfect option to respond to a risk of harm to an inmate. *See Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004). A defendant need not "take perfect action or even reasonable action[,] . . . his action must be reckless before § 1983 liability can be found." *Cavalieri*, 321 F.3d at 622. The Court cannot say, for example, that the only reasonable response to Balsewicz's suicide threats in December 2016 would have been to place her in clinical observation with no clothing and no glasses and to give her only liquid medication so she could not hoard it. The pertinent inquiry is whether the defendants took reasonable steps to stop her from committing suicide, in light of what they knew about

---

[7]As to the third suicide attempt, the defendants also argue that Balsewicz was never at a substantial risk of serious harm because, based on her lithium levels at the hospital, it is unlikely that Balsewicz actually ingested a toxic amount of pills. *See* (Docket #42 at 20–21). Because the Court finds that the defendants' response to Balsewicz's alleged overdose attempt was reasonable and not deliberately indifferent, it need not decide whether Balsewicz swallowed enough pills to put her at risk of serious harm.

Balsewicz's suicidality. Placing Balsewicz on observation status, where she was monitored by camera and with check-ins at fifteen-minutes intervals, was not an unreasonable choice.

Balsewicz's suicidality and the defendants' response thereto stands in contrast to cases like *Pittmann*, where the officers totally ignored the inmate's requests for crisis counseling, *Pittmann*, 746 F.3d at 772, or *Sanville*, where prison guards left a suicidal inmate in his cell, unsupervised, for hours, *Sanville*, 266 F.3d at 739. More telling still is a comparison between her case and *Mombourquette ex rel. Mombourquette v. Amundson*, 469 F. Supp. 2d 624 (W.D. Wis. 2007). There, the court found a jury question existed where, upon returning from the hospital after a suicide attempt, correctional officers did not place the inmate on suicide watch, put her in observation, or keep her away from dangerous objects. *Id.* at 649. By contrast, it is indisputable here that Balsewicz was placed on clinical observation immediately when she expressed an intent to commit suicide, and staff made deliberate choices about allowing her to have clothing while on observation based on their assessment of her mood.

Thus, no reasonable jury could find that the WRC defendants were deliberately indifferent because they responded reasonably to the risk of harm to Balsewicz. *See Peate v. McCann*, 294 F.3d 879, 882 (7th Cir. 2002) ("[P]rison officials who actually knew of a substantial risk to inmate health or safety are free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted, because in that case it cannot be said that they were deliberately indifferent.").

### 4.2 Deliberate Indifference to Balsewicz's Gender Dysphoria

Balsewicz next claims that Drs. Schmidt and Blumer were deliberately indifferent to her gender dysphoria by delaying action on her

gender dysphoria assessment. Specifically, Balsewicz challenges Dr. Schmidt's failure to send Halper's report to the Transgender Committee altogether and Dr. Blumer's alleged month-long delay in sending the report to the committee. Balsewicz claims that these missteps caused a delay in her seeing Osborne, which in turn caused a delay in her receiving hormone therapy treatment.

The same elements of an Eighth Amendment claim explained above apply to this deliberate indifference claim as well. That is, to show deliberate indifference, Balsewicz must prove that "(1) [she] had an objectively serious medical condition; (2) the defendants knew of the condition and were deliberately indifferent to treating [her]; and (3) this indifference caused [her] some injury." *Gayton*, 593 F.3d at 620. The defendants argue that Balsewicz has not created a jury question as to the second or third elements against either Dr. Schmidt or Dr. Blumer.

Taking the question of deliberate indifference first, it is uncontested that both Dr. Schmidt and Dr. Blumer knew of Balsewicz's serious medical need when they learned that she had been assessed for, and given a provisional diagnosis for, gender dysphoria. As to Dr. Schmidt, the defendants further concede that he failed to send Halper's report to Dr. Kallas on the Transgender Committee in April 2016. However, Dr. Schmidt testified by declaration that this failure was an accidental oversight. (Docket #46 at 3). Balsewicz provided no evidence to contradict or call into question Dr. Schmidt's averment that his inaction was accidental. An innocent mistake of this sort does not violate the Constitution. *See Armato v. Grounds*, 766 F.3d 713, 721 (7th Cir. 2014) ("Deliberate indifference requires more than negligence, rather the defendant must meet essentially a criminal

recklessness standard, that is, ignoring a known risk.") (quotation and internal punctuation omitted).

As the Seventh Circuit has explained, summary judgment is the "put up or shut up" moment in a lawsuit. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). "Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials that 'set forth specific facts showing that there is a genuine issue for trial.'" *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008) (citing Fed. R. Civ. P. 56(e)). Balsewicz has not provided evidence sufficient to create a jury question as to whether Dr. Schmidt was deliberately indifferent by failing to forward Halper's gender dysphoria assessment to the Transgender Committee.

As to Dr. Blumer, the evidence in the record shows that he learned on September 23, 2016 from Balsewicz's assigned psychologist at the WRC that Balsewicz had undergone a gender dysphoria assessment while at Waupun. On that same day, he forwarded the report to Dr. Kallas so that Balsewicz's request for treatment could be considered by the Transgender Committee. There is no evidence of any delay on Dr. Blumer's part. Therefore, Balsewicz has not created a jury question as to whether Dr. Blumer was deliberately indifferent to her gender dysphoria.

Finally, the defendants argue that the five-month delay between Halper completing her report and Dr. Kallas receiving it did not impact the timeline on which Balsewicz was approved for hormone therapy. Therefore, they argue, Balsewicz cannot prove the third element of a deliberate indifference claim against either Dr. Schmidt or Dr. Blumer.

Because the Court has already found that Balsewicz's claims fail on the second element, it need not reach this additional ground for dismissal.

### 4.3 First Amendment Retaliation

Balsewicz's final claim is that all WRC defendants violated her First Amendment right to file grievances by removing her from DBT and generally ignoring her suicide threats in retaliation for complaining that Srnka engaged in sexually inappropriate conversations during therapy sessions. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000) ("An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution."); *Gomez v. Randle*, 680 F.3d 859, 866–67 (7th Cir. 2012) (inmates have a First Amendment right to file non-frivolous grievances about prison staff).[8]

In order to prevail on her claim of retaliation, Balsewicz must show that "(1) [s]he engaged in activity protected by the First Amendment; (2) [s]he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendant's decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (quotation and internal marks omitted). Once Balsewicz meets her burden, the burden shifts to the defendants to show that the harm would have occurred anyway. *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

The defendants argue that Balsewicz has failed to establish a *prima facie* case for retaliation on each element. As to the first element, the

---

[8]Balsewicz admits that defendants Schraa, Lenz, Lennop, Kremer, Bessert, Helmeid, and Franklin had no part in the decision to remove Balsewicz from therapy. (Docket #61 at 4.) Lacking personal involvement in the decision, those defendants cannot be liable for Balsewicz's retaliation claim as it relates to DBT treatment. *See Higgin v. Johnson*, 346 F.3d 788, 793 (7th Cir. 2003).

defendants argue that Balsewicz's complaint about Srnka was not First Amendment protected speech because it was a false accusation. *See Matter of Palmisano*, 70 F.3d 483, 487 (7th Cir. 1995) ("False statements, made with reckless disregard of the truth, 'do not enjoy constitutional protection.'"); *Tate v. Jenkins*, No. 09-CV-169, 2010 WL 3809765, at *8 (E.D. Wis. Sept. 24, 2010) (lying about prison staff is not protected by the First Amendment).

The defendants' factual submissions on this point center on whether Srnka had actually initiated sexually inappropriate conversations in her sessions with Balsewicz or, instead, merely listened and responded when Balsewicz talked about sexually explicit matters. (Docket #70 at 1–4). Balsewicz, on the other hand, introduces evidence, including a declaration from another inmate, to show that he could not have gotten blue panties from the prison, so they must have been given to her by Srnka. (Docket #37-4 at 13–14). The Court need not wade too deeply into this factual dispute, because even assuming Balsewicz's complaint was not frivolous, she has failed to create a jury question on the third element of her retaliation claim—that she was removed from DBT and that her suicide threats were ignored because of her complaint about Srnka.

The only evidence in the record to support the third element of Balsewicz's retaliation claim is Balsewicz's speculation about the timing of her complaint about Srnka in relation to her removal from DBT. *See* (Docket #70 at 1–4). Balsewicz claims that she told Spiegelberg during a November 1, 2016 DBT session that she and Srnka had had sexually explicit conversations. *Id.* at 2. On November 2, Spiegelberg sent an email to Franklin, Danforth, and Srnka to discuss statements Balsewicz had made to her about having had sexual relationships with staff members in the 1990s and having had intimate relationships with other inmates. *Id.* Spiegelberg

asked Srnka if Balsewicz had told her similar things, and Srnka responded affirmatively. *Id.* Franklin responded to the email that he would "pass this information on" and "get back to everyone about PREA." *Id.* at 4; (Docket #49-1 at 2). On November 3, the DBT consultation team removed Balsewicz from DBT group therapy and placed her back in DBT pre-treatment. (Docket #70 at 4). On December 1, 2016, the DBT consultation team removed Balsewicz from DBT group therapy altogether. *Id.*

This evidence is not sufficient to show that any defendant was motivated to remove Balsewicz from DBT (or ignore her suicidality) because of her complaint about Srnka. True, a prisoner may demonstrate improper motive by pointing to circumstantial evidence suggesting a retaliatory motive, such as suspicious timing or statements by the defendants suggesting that they were bothered by the protected conduct. *Mullin v. Gettinger,* 450 F.3d 280, 285 (7th Cir. 2006); *Culver v. Gorman & Co.,* 416 F.3d 540, 545–50 (7th Cir.2005). However, at summary judgment "mere temporal proximity is not enough to establish a genuine issue of material fact." *Andonissamy v. Hewlett–Packard Co.,* 547 F.3d 841, 851 (7th Cir. 2008) (internal quotation omitted). Without more than her suspicions about the time her DBT treatment ended (and no evidence connecting her statement to the defendants ignoring her suicidality), Balsewicz has failed to satisfy her burden to make a *prima facie* showing of retaliatory motive.

Further, even if Balsewicz could show that her complaint about Srnka was a motivating factor in the defendants' decision to remove her from DBT, the defendants have introduced evidence sufficient to show that Balsewicz would have been removed anyway. Balsewicz was removed from DBT therapy because she was overly focused on transgender issues

during DBT, which is not a therapy for gender dysphoria, and because she exhibited low-commitment and lack of cooperation in DBT treatment.

Because Balsewicz has not shown that the WRC defendants had a retaliatory motive for removing her from DBT treatment or ignoring her suicidality, the defendants are entitled to summary judgment on Balsewicz's First Amendment claim.

5.    **CONCLUSION**

On the undisputed facts in the record, summary judgment is appropriate in favor of the defendants on all of Balsewicz's claims.[9] The Court must, therefore, grant the defendants' motion, deny Balsewicz's motion as moot, and dismiss this action with prejudice.

Accordingly,

**IT IS ORDERED** that the Defendants' motion for summary judgment (Docket #41) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that the Plaintiff's motion for summary judgment (Docket #33) be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of March, 2019.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge

---

[9]Because the Court finds summary judgment is appropriate on the merits on each of Balsewicz's claims, the Court does not reach the defendants' request for application of the doctrine of qualified immunity. *See* (Docket #42 at 27-30).